**Affirmed and Opinion Filed January 31, 2018**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00135-CR

**CHRISTEN CECILIA CRAWFORD, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 6**
**Collin County, Texas**
**Trial Court Cause No. 006-82244-2016**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Whitehill

A jury convicted appellant Christen Cecilia Crawford of driving while intoxicated, and the trial judge sentenced her to 180 days in jail, fined her $400, suspended confinement, and placed appellant on community supervision for fifteen months. Appellant raises five issues on appeal. We affirm.

## I. BACKGROUND

At nearly 1:00 a.m., a Frisco police officer responding to a report of screaming in the neighborhood saw appellant illegally park her car too close to a stop sign immediately after pulling out of an alley. When the officer turned on his emergency lights, appellant drove a short distance away before stopping again. The officer arrested appellant after she failed several field sobriety tests.

The State's information charged appellant with driving while intoxicated with an alcohol-concentration level of 0.15 or more. The jury charge, however, omitted the alcohol-concentration element from the offense's definition. The jury found her guilty of driving while intoxicated, and the trial court sentenced her as described above.

## II. ANALYSIS

### A. Issue Two: Was the evidence sufficient to support appellant's conviction?

Appellant's second issue challenges the sufficiency of the evidence, so we address it first.

#### 1. Standard of Review and Applicable Law

We review the sufficiency of the evidence to support a conviction by viewing all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

This standard gives full play to the factfinder's responsibility to resolve testimonial conflicts, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id*. at 319. And the factfinder is the sole judge of the evidence's weight and credibility. *See Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of the evidence viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). We must presume that the factfinder resolved any conflicting inferences in the verdict's favor and defer to that resolution. *Id.* at 448–49. The standard of review is the

same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Dobbs*, 434 S.W.3d at 170.

A person commits the offence of driving while intoxicated if the person operates a motor vehicle in a public place while intoxicated. TEX. PENAL CODE § 49.04(a). "Intoxicated" means, among other things, not having the normal use of mental or physical faculties by reason of the introduction of alcohol or any other substance into the body. *Id.* § 49.01(2)(A).

"[T]he uncorroborated testimony of an arresting officer is sufficient to prove the element of intoxication." *Dumas v. State*, 812 S.W.2d 611, 615 (Tex. App.—Dallas 1991, pet. ref'd).

### 2.     The Evidence

The principal witness at trial was Frisco police officer Kevin Ketchum, who testified to the following facts:

On the night in question, Ketchum had been with the Frisco police department a little over one year. Before that, he had seventeen years of experience as a deputy in Ellis and Kaufman Counties. He was certified to administer Standardized Field Sobriety Tests. He was also certified as an Advanced Roadside Impaired Driving Enforcement officer, which refers to "an advanced form of intoxication detection."

Ketchum was on patrol duty the night of February 7–8, 2016. At about 12:45 a.m., he was dispatched to a particular area in Frisco in response to a report of screaming in the area. He drove to the neighborhood and saw a car emerging from an alley. The car turned onto the street and stopped at a stop sign. Then its lights went out. Ketchum turned on his emergency lights because the car was illegally parked too close to the stop sign. The car's lights came back on, and the car drove away, so Ketchum followed and turned on his siren. The car then stopped in front of a residence.

As soon as the car stopped, the driver—appellant—got out. Ketchum talked to her and noticed "a moderate odor of alcohol" on her breath. He asked her if she had been drinking, and she said she had. She also said that she had been assaulted and someone had tried to strangle her. Other officers on the scene attempted to find the assailant.

Ketchum asked appellant if she would consent to some field sobriety tests. She was "a little hesitant"—Ketchum later described her as "somewhat passive-aggressive and argumentative"—but she agreed. He first had her perform the horizontal gaze nystagmus test. Appellant displayed all six possible "clues" indicating intoxication.

Then she performed the walk-and-turn test. During that test appellant displayed five out of eight possible clues. The "decision point" for that test is two clues. After that test, Ketchum thought appellant appeared to be impaired by alcohol.

The last test appellant performed was the one-leg stand. In that test, she displayed three of four possible clues, which exceeded the decision point.

Based on the test results and appellant's admission that she had been drinking, Ketchum "felt like she was too impaired to be driving."

After the officers took more information from appellant regarding the disturbance call, she was arrested for driving while intoxicated. At the jail, Ketchum again asked appellant how much she had had to drink, and she replied that she had had ten beers. Ketchum did not ask her how large those beers were. He asked her when she had eaten last, and she said she had some snacks around 11:30 or 12:00. In Ketchum's opinion, appellant did not have the normal use of her mental faculties.

On cross-examination, however, Ketchum said, "At the scene, [appellant] seemed like she had the use of her mental faculties." When asked, "[W]hat did you see that indicates she did

–4–

not have her physical faculties?" he answered, "The physical faculties was based off of my observations of her" field sobriety tests. He also testified about appellant's behavior at the jail:

> Q. Did you see anything in that room [at the jail] that indicated to you that she didn't have the normal use of her mental faculties?
>
> [A.] Other than the fact that she admitted to having ten beers? No.
>
> Q. . . . She had mental faculties? That's my question for you.
>
> A. She answered all my questions and signed the necessary documents without hesitation, or without a problem, if that's what you're asking. She indicated to me she understood everything fine.
>
> . . . .
>
> Q. . . . Where did she not have her physical faculties?
>
> A. When we're at the facility she—she seemed like she did. She was fine.

Ketchum also said that the jail interview took place about an hour after his first contact with appellant at 12:45.

One other police officer also testified at trial. He said that he was at the scene of appellant's arrest and he smelled beer on the exterior passenger side of appellant's car.

Two videos were also admitted into evidence. One was recorded by a dashboard camera in Ketchum's police car. It shows all of Ketchum's interaction with appellant at the scene. Although the view is largely obstructed by appellant's car, most of their conversation is audible on the recording. Appellant's speech seems normal. At one point she said, "I'm not drunk right now," but later she said, "I don't think I'm drunk right now, but I don't know."

The second video shows appellant standing in a room at the police station or jail. Ketchum entered the room, read appellant her rights, and got her to sign some paperwork. Then Ketchum and appellant discussed whether she would consent to give a blood specimen. During that conversation, appellant said, "I don't feel like I'm drunk right now, but maybe I am. I don't know." She also said that she had been drinking beer that evening and that she drank about ten

beers during the time period from 6 p.m. to midnight. In the video, appellant's speech seems normal, and she shows no obvious signs of intoxication such as swaying or needing to support herself.

### 3. Application of the Law to the Facts

Ketchum testified that he has special training in administering field sobriety tests and in intoxication detection. He observed appellant park illegally at a stop sign and then drive away when he activated his emergency lights. He then observed a moderate odor of alcohol on appellant's breath, and she admitted that she had been drinking. Appellant failed three field sobriety tests and later admitted that she had consumed about ten beers between 6 p.m. and midnight. Ketchum concluded at the arrest scene that appellant was "too impaired to be driving." Appellant's performance in the field sobriety tests led him to conclude that appellant did not have her physical faculties. He testified that in his opinion appellant did not have the normal use of her mental faculties.

Appellant argues that parts of the record show facts or raise inferences inconsistent with the verdict. For example, she argues that (i) she did not drive in a dangerous manner, (ii) her speech was clear and coherent, and (iii) she did not sway or stagger while walking. She contends that there was no evidence that her eyes were bloodshot or glassy. And she asserts that the evidence raised questions about the accuracy of Ketchum's interpretations of the field sobriety tests. On cross-examination, Ketchum acknowledged that (i) he had misspoken in some manner about the horizontal gaze nystagmus test, (ii) he forgot what the decision point was on the one-leg-stand test, and (iii) he wrote down one clue too many on the walk-and-turn test. Ketchum also said that appellant seemed to have her mental faculties at the scene and, aside from admitting that she had had ten beers, seemed to have her physical faculties at the jail.

But at this stage "[t]he issue is not whether the defense evidence 'outweighs' the State's evidence." *Watkins v. State*, 741 S.W.2d 546, 549 (Tex. App.—Dallas 1987, pet. ref'd). The jury was entitled to weigh the evidence, *Dobbs*, 434 S.W.3d at 170, and we must affirm if any rational factfinder could have found the crime's elements beyond a reasonable doubt, *Jackson*, 443 U.S. at 319.

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence of appellant's impaired condition was sufficient to support the conviction. *See Dumas*, 812 S.W.2d at 615–16 (rejecting sufficiency challenge to DWI conviction); *Watkins*, 741 S.W.2d at 548–49 (same). We overrule issue two.

**B.** **Issue One: Was appellant entitled to a directed verdict of acquittal because (i) the State introduced no evidence of the alcohol concentration level alleged in the information and (ii) the State never amended the information or struck the alcohol concentration level allegation?**

Appellant's first issue argues that she was entitled to a directed verdict of acquittal because (i) the State's information alleged that she committed the offense of driving while intoxicated with an alcohol concentration level of 0.15 or more and (ii) there was no evidence of her alcohol concentration level. The State replies that it was entitled to abandon the alcohol concentration element and instead prosecute the lesser included offense of driving while intoxicated. We agree with the State because appellant had notice that the State would attempt to prove the elements of the offense for which she was convicted.

**1.** **The Trial**

The information alleged that appellant operated a motor vehicle in a public place while intoxicated and that an analysis of her blood, breath, or urine showed an alcohol concentration of 0.15 or more. This offense is a Class A misdemeanor. TEX. PENAL CODE § 49.04(d).

At a pretrial hearing four days before trial, the prosecutor said, "And, for the record, this case is a Chris Youngkin case. The State will not be seeking to introduce any evidence of the blood test or the results from this case."

At the beginning of the trial, when appellant was arraigned, the prosecutor read the information to the jury but omitted the allegation regarding appellant's alcohol concentration level. Appellant then pled not guilty, and the trial proceeded.

Both sides rested and closed at the beginning of the second day of trial. Appellant then moved for directed verdict because (i) the information had not been changed and (ii) there was no evidence of appellant's alcohol concentration level. The prosecutor responded that (i) appellant knew before trial that the State was not going to offer any blood test evidence and (ii) the case should be submitted to the jury on the lesser included offense of driving while intoxicated, which is a Class B misdemeanor. *See id*. §§ 49.04(a)–(b). Appellant replied that the alcohol concentration allegation remained an element of the State's case because the State had not moved to strike that allegation from the indictment pretrial or even before closing its case. The trial court found that there was no surprise to appellant and ruled that it would submit driving while intoxicated to the jury. Appellant objected to the jury charge as charging her with a crime not alleged in the information, and the trial court overruled her objection.

## 2. Applicable Law and Application to This Case

Appellant was convicted of driving while intoxicated, a Class B misdemeanor under Penal Code § 49.04(b). That offense is a lesser included offense of the Class A misdemeanor of driving while intoxicated with an alcohol concentration of 0.15 or more under Penal Code § 49.04(d). *Ex parte Navarro*, 523 S.W.3d 777, 780 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

When a charging instrument alleges an offense that includes lesser offenses, the defendant may be tried and convicted of a lesser offense. *Woodard v. State*, No. 05-02-00698-CR, 2003 WL 203520, at *1 (Tex. App.—Dallas Jan. 31, 2003, no pet.) (not designated for publication). The State can abandon an allegation in the indictment without triggering Code of Criminal Procedure articles 28.10 and 28.11 if the effect is to reduce the charged offense to a lesser included offense. *Duenas v. State*, No. 05-14-00192-CR, 2015 WL 1243345, at *4 (Tex. App.—Dallas Mar. 16, 2015, no pet.) (mem. op., not designated for publication). "In fact, the State can abandon an element of the charged offense *without prior notice* and proceed to prosecute a lesser-included offense." *Grey v. State*, 298 S.W.3d 644, 650, 651 (Tex. Crim. App. 2009) (emphasis added) (footnote omitted).

The facts of this case are much like those in *Hardie v. State*, 79 S.W.3d 625 (Tex. App.—Waco 2002, pet. ref'd). In that case, Hardie was indicted for manufacturing more than 400 grams of methamphetamine. But on the first day of trial, the prosecutor stated, "We intend to prove up the lesser included offense of this in the indictment," and when he read the indictment to the jury he changed the allegation to manufacture of more than 200 grams of methamphetamine. At the trial's end, the jury charge submitted the crime of manufacturing more than 200 but less than 400 grams of methamphetamine, and the jury convicted Hardie. On appeal, Hardie argued that the failure to amend the indictment entitled him to acquittal or a new trial, but the court of appeals disagreed and held that the trial court "did not err in allowing the DA to proceed on only the lesser included offense." *Id*. at 632.

We faced similar facts in *Duenas* and reached the same conclusion. 2015 WL 1243345, at *4–5; *see also Fant v. State*, No. 05-98-00793-CR, 1999 WL 675432, at *2 (Tex. App.—Dallas Sept. 1, 1999, pet. ref'd) (not designated for publication) ("We conclude the original

indictment, even though not altered, authorized appellant's ultimate conviction for the lesser included offense contained in the jury charge.").

However, appellant relies on *Sanchez v. State*, in which the court of criminal appeals said, "As a general rule, the [jury] instructions must also conform to allegations in the indictment." 376 S.W.3d 767, 773 (Tex. Crim. App. 2012). But this is only a general rule. As the court held in *Grey*, "the State can abandon an element of the charged offense without prior notice and proceed to prosecute a lesser-included offense." 298 S.W.3d at 650. Thus, appellant's complaint that "here the State abandoned an element of the charged-offense" is unavailing.

Appellant attempts to sidestep *Grey* by arguing that "even if abandonment of the [0.15 alcohol concentration] allegation was permissible, **no** such abandonment occurred in this case." We disagree. The State (i) said at a pretrial hearing that it would not seek to introduce any blood test evidence, (ii) omitted the 0.15 alcohol concentration allegation when it read the indictment to the jury, and (iii) sought to charge the jury only on the lesser included offense. This is essentially the same procedure as was used in *Hardie*, 79 S.W.3d at 631–62, and *Duenas*, 2015 WL 1243345, at *3–4. We hold that the State effectively abandoned the charged offense in favor of prosecuting the lesser included offense.

Finally, appellant appears to argue that she was denied fair notice of the exact nature of the charge or the facts in controversy. We reject this argument too. "[T]he submission of a lesser-included offense does not violate the defendant's constitutional due-process right to notice of the crime of which he is accused" because proof of a greater offense necessarily proves all lesser included offenses. *Wasylina v. State*, 275 S.W.3d 908, 910 (Tex. Crim. App. 2009).

We overrule appellant's first issue.

**C.** **Issue Three: Did the trial court err by submitting the mental faculties prong of intoxication to the jury?**

Appellant argues that the jury charge was erroneous because (i) there was no evidence that she did not have normal use of her mental faculties and (ii) the charge allowed the jury to convict her if it found that she did not have the normal use of either her mental or physical faculties "by reason of the introduction of alcohol into the body."

Appellant did not object to the jury charge on this basis, so she is entitled to reversal only if the jury charge was erroneous and the error was so egregious and created such harm that she did not receive a fair and impartial trial. *See Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

We conclude that the jury charge was not erroneous. The jury charge tracked the statute by disjunctively submitting the "mental faculties" and the "physical faculties" ways of proving the offense. *See* TEX. PENAL CODE §§ 49.01(2)(A), 49.04(a). Those theories are not mutually exclusive, and as long as there is evidence that would support both theories, both theories are properly submitted in the jury charge. *See Kirsch v. State*, 306 S.W.3d 738, 743 (Tex. Crim. App. 2010) (applying this rule to the "impairment" and the "per se" intoxication theories).

In arguing that there was no evidence to support the mental faculties instruction, appellant focuses on parts of Ketchum's testimony that are favorable to her position. Specifically, on cross-examination Ketchum testified as follows:

> Q. Did you see anything in that room [at the jail] that indicated to you that she didn't have the normal use of her mental faculties?
>
> (Brief pause.)
>
> THE WITNESS: Other than the fact that she admitted to having ten beers? No.
>
> Q. Okay. She had mental faculties? That's my question for you.
>
> A. She answered all my questions and signed the necessary documents without hesitation, or without a problem, if that's what you're asking. She indicated to me she understood everything fine.

–11–

. . . .

Q. So other than the Field Sobriety Tests, can you tell me, out at the scene, what you saw that indicated to you that she didn't have the normal use of her mental faculties?

A. Mental faculties?

Q. Uh-huh.

A. At the scene, she seemed like she had the use of her mental faculties.

However, Ketchum also gave other testimony indicating that appellant had lost the normal use of her mental faculties. For example, he observed her drive a car out of an alley and park next to a stop sign, which is not normal. When he turned on his emergency lights, appellant did not stay stopped but instead drove away until he turned on his siren. He thought it was not normal that appellant immediately exited her vehicle when she stopped again. When appellant performed the walk-and-turn test, she took the wrong number of steps, she made an improper turn, and she failed to count out loud as instructed. Ketchum testified that, after the walk-and-turn test, appellant "appeared to be impaired." After appellant completed all the field sobriety tests, Ketchum "felt like she was too impaired to be driving." Finally, Ketchum was asked, "In your trained opinion, do you feel that [appellant] had the normal use of her mental faculties?" He answered, "No, she did not, in my opinion."

Thus, there was evidence to support submitting the mental faculties issue to the jury. Although Ketchum may have contradicted himself on this point, the jury "was entitled to believe all or part of the conflicting testimony proffered and introduced by either side." *Bell v. State*, 693 S.W.2d 434, 443 (Tex. Crim. App. 1985). The trial court did not err by submitting the mental faculties issue to the jury.

We overrule appellant's third issue.

**D.** **Issue Four: Did the information fail to invoke the trial court's jurisdiction for lack of a valid supporting affidavit?**

Appellant next argues that the affidavit filed in support of the information was defective because the affiant's signature is illegible and the affiant is not identified anywhere in the affidavit. According to appellant, this defect caused the information to violate the statutory directive that "[n]o information shall be presented until affidavit has been made by some credible person charging the defendant with an offense." TEX. CODE CRIM. PROC. art. 21.22. Appellant acknowledges that she did not object to this defect in the trial court, but she contends that the defect is jurisdictional so no preservation was necessary.

We conclude that error preservation was necessary. The Texas Constitution provides, "The presentment of an indictment or information to a court invests the court with jurisdiction of the cause." TEX. CONST. art. V, § 12(b). Under this provision, "the mere presentment of an information to a trial court invests that court with jurisdiction over the person of the defendant, regardless of any defect that might exist in the underlying complaint."[1] *Ramirez v. State*, 105 S.W.3d 628, 629 (Tex. Crim. App. 2003). Thus, even if the supporting affidavit here is defective as appellant argues, the defect is not jurisdictional and a trial court objection was necessary to preserve error. *See id.* at 629–30 (defendant forfeited argument that affidavit supporting information gave incorrect name for defendant); *Strickland v. State*, No. 05-10-00438-CR, 2011 WL 1367045, at *2 (Tex. App.—Dallas Apr. 12, 2011, no pet.) (not designated for publication) (defendant forfeited argument that there was no affidavit to support the information against her).

We overrule appellant's fourth issue.

**E.** **Issue Five: Given that appellant was jailed for several days for violating a condition of her release on community supervision, would it violate the Double Jeopardy**

---

[1] The affidavit supporting an information is also called a complaint. *See* CRIM. PROC. art 21.22 (entitled "Information based upon complaint").

**Clause to affirm her conviction and require her to serve any additional jail time or submit to community supervision?**

Appellant last argues that the trial court improperly jailed her for several days after she perfected her appeal. She contends that this confinement constitutes a punishment such that the Double Jeopardy Clause protects her from being punished again by confinement or community supervision even if we affirm her conviction. We disagree because her jailing, even if legally improper, was not a separate punishment for double jeopardy purposes.

## 1. Relevant Facts

The jury returned its guilty verdict at about 10:53 a.m. on January 31, 2017. After a brief recess, the trial judge stated on the record that he would sentence appellant in keeping with the punishment agreed upon by her attorney and the State, that being a $400 fine and 180 days' confinement in jail suspended for fifteen months. The judge orally explained the conditions of appellant's community supervision. Then the judge addressed appellant by saying, "Ms. Crawford, have a seat. I do have additional paperwork for you." Appellant's lawyer then said, "Judge, I do expect that there will be a Notice of Appeal filed in the case. . . . [B]ut she's going to do whatever she needs to do in the meantime." The judge replied, "Perfect," and the reporter's record ends at that point.

That same day, the judge signed the judgment, and he and appellant signed the order placing appellant on community supervision, but the record does not disclose what time those events happened.

That same day the court issued a capias for appellant's arrest. The sheriff's return bears a stamp indicating the capias was received at 2:28 p.m., and it further states that the capias was executed at 3:30 p.m.

Appellant's notice of appeal was filed at 4:04 p.m. that same day.

–14–

On February 2, 2017, appellant was brought before the trial court. She had an attorney at that hearing. The trial judge questioned Nancy Tenorio, his court clerk, and Jana Dickey, who worked in the community supervision and corrections department (the "department"), regarding what had happened on January 31st. According to them, the following sequence of events occurred:

- Tenorio said that she generated the paperwork after sentencing. Appellant was unwilling to sign and thumbprint the paperwork unless the bailiff did it. Tenorio never gave appellant permission to leave.

- At some point, appellant went to the department's office and received some paperwork to fill out. Appellant expressed concern about her bond because she had overpaid, and there was some discussion about that. Ultimately appellant "said that she didn't have time for this, that she was leaving, she was going to lunch," and left the courthouse.

- Dickey talked to appellant on the phone twice, and during the second conversation Dickey told appellant that the judge had issued the warrant and that appellant would be arrested when she returned to the courthouse.

- Appellant returned to the courthouse, and Dickey started processing her paperwork. The bailiff then showed up (presumably to arrest appellant).

- Dickey never told appellant she was free to leave.

At the end of the hearing, the trial judge addressed appellant:

I'm going to continue with the previous order that I had with regards to punishment; however, you are also going to serve five days as a term and condition of your community supervision in the Collin County jail. . . . [I]f I'm affirmed on my rulings and you're placed on community supervision, and you get revoked going forward, that five days that you will serve as a term and condition of your community supervision will not be credited as back time credit.

The judge also made comments indicating that he believed appellant's appeal was not yet perfected because he had not yet set an appeal bond. That same day, the judge and appellant signed an amended order placing appellant on community supervision that added five days in jail (beginning January 31, 2017) as a condition.

–15–

### 2.     Analysis

Appellant relies on the Double Jeopardy Clause, which is violated under three circumstances: (i) a second prosecution for the same offense after acquittal, (ii) a second prosecution for the same offense after conviction, and (iii) multiple punishments for the same offense. *See Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014). This case concerns only the third possibility.

Appellant contends that making her serve her sentence in this case after affirmance would amount to a "second punishment" for the same offense because she has already served five days in jail. Although appellant did not assert this claim in the trial court, she can raise it for the first time on appeal if (i) the undisputed facts show that the double jeopardy violation is clearly apparent from the face of the record and (ii) enforcing the usual procedural default rules serves no legitimate state interest. *Id*.

But appellant's argument does not focus on what would seem to be the crux of a double jeopardy complaint—whether her five-day incarceration was a forbidden additional punishment for driving while intoxicated. Rather, she focuses on the legality of the February 2nd order that modified her community supervision conditions by adding a five-day incarceration condition. She cites case authority establishing that an appeal stays the commencement of a community supervision term until the appellate mandate issues. *See, e.g.*, *Lundgren v. State*, 434 S.W.3d 594, 598 (Tex. Crim. App. 2014). She then cites *Simon v. State*, 442 S.W.3d 581, 585 (Tex. App.—San Antonio 2014, no pet.), for the premise that the trial court has no jurisdiction to modify community supervision conditions while the case is pending on appeal. So, if the issue were before us and we were to follow *Simon*, we would presumably conclude that the trial judge erred by adding the five-day incarceration condition to appellant's community supervision. But

we do not see that appellant's incarceration was, for double jeopardy purposes, a separate punishment for driving while intoxicated.

We have found no case authority on point to support appellant's position, and some authority contrary to it. In *Molinar v. State*, Molinar was convicted of a felony and placed on community supervision. No. 14-08-00749-CR, 2010 WL 2853885, at *1 (Tex. App.—Houston [14th Dist.] July 22, 2010, pet. dism'd, untimely filed) (mem. op., not designated for publication). At some point, his community supervision conditions were modified to add a fourteen-day stay in jail, which he served. Later the State moved to revoke his community supervision for several reasons, and the trial court granted the motion. On appeal, Molinar argued that (i) the revocation was based in part on the same conduct that previously caused him to be jailed for fourteen days and thus (ii) it violated the Double Jeopardy Clause to punish him again after he served the fourteen days in jail. The appellate court rejected his argument because he had signed the "conditions to community supervision" document, thus agreeing that the trial court could alter or modify his community supervision conditions. *Id.* at *3. Under these circumstances, the court reasoned, the fourteen-day jailing was not "punishment" within the meaning of the Double Jeopardy Clause:

> [T]he jail time Molinar served was not a "punishment," but a modified condition of his community supervision that he agreed to fulfill. The "Conditions to Community Supervision" document Molinar signed informed him that his conditions could be modified; therefore, the fourteen days in jail do not constitute a punishment from which there could be any double-jeopardy implications.

*Id.*

In this case, appellant also signed a community supervision conditions document, and that document likewise told her that the trial court could modify the conditions at any time. Even if the court imposed her five-day jailing in error, under *Molinar* that jailing was not punishment for double jeopardy purposes.

We also note *Eubanks v. State*, 11 S.W.3d 279 (Tex. App.—Texarkana 1999, no pet.). Eubanks was placed on community supervision after pleading guilty to delivering marijuana. *Id.* at 280. Later his community supervision was revoked, and he was sentenced to five years' imprisonment with 252 days of jail time credited against his sentence. *Id.* He appealed, arguing that the prison sentence violated the Double Jeopardy Clause because he had already served more than 180 days in jail, which was the most the court could legally require as a community supervision condition. *Id.* at 281. The court rejected his argument, concluding that Eubanks had cited no authority and did not provide argument sufficient to demonstrate his position's correctness under the law. Here, although appellant cites many cases, we have not found any authority holding that an erroneously imposed modification of community supervision conditions constitutes an additional punishment that raises double jeopardy concerns.

We conclude that the undisputed facts do not show a double jeopardy violation that is clearly apparent from the face of the record. Accordingly, we overrule appellant's fifth issue.

## III. CONCLUSION

We affirm the trial court's judgment.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
170135F.U05

–18–



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

CHRISTEN CECILIA CRAWFORD,
Appellant

No. 05-17-00135-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Court at Law
No. 6, Collin County, Texas
Trial Court Cause No. 006-82244-2016.
Opinion delivered by Justice Whitehill.
Justices Lang and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered January 31, 2018.